UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOMNIA, INC.,

                Plaintiff,

-against-

CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, as successor-in-interest to PST SERVICES, INC., et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

19-CV-08983 (PMH)

PHILIP M. HALPERN, United States District Judge:

    Plaintiff Somnia, Inc. ("Plaintiff") initiated this breach of contract action against Defendants Change Healthcare Technology Enabled Services, LLC, as successor-in-interest to PST Services, Inc. ("CHT") and PST Services, Inc. ("PST" and collectively, "Defendants") in the New York State Supreme Court, Westchester County, on March 15, 2019. (Doc. 1, "Not. of Rem."). Defendants removed the action to this Court on September 26, 2019. (*Id.*). Plaintiff, with leave of Court, filed its First Amended Complaint thereafter on April 20, 2020. (Doc. 33, "FAC").[1] The First Amended Complaint presses two claims for relief: (1) breach of contract (*id.* ¶¶ 184-210); and (2) fraud (*id.* ¶¶ 211-21).

    Defendants served their motion to partially dismiss the First Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) on July 10, 2020. (Doc. 42; Doc. 43, "Def. Br."). Plaintiff served its opposition on August 10, 2020 (Doc. 44, "Opp. Br."), and the motion was briefed fully with service of Defendants' reply on August 17, 2020 (Doc. 45, "Reply Br.").

    For the reasons set forth below, Defendants' motion to dismiss is GRANTED in part.

---

[1] Judge Karas, before whom this matter proceeded before reassignment to this Court on April 16, 2020, granted Plaintiff leave to file its First Amended Complaint by April 17, 2020. (Doc. 31). The Clerk of the Court rejected Plaintiff's attempt to file the pleading on that date as deficient. (Apr. 20, 2020 Entry).

**BACKGROUND**

I.  Plaintiff's Business

Plaintiff, "a nationwide provider of expert and tailored anesthesia services" (FAC ¶ 1), has existed in its current form since at least September 2002 (*id.* ¶ 24). Among the various services Plaintiff offers its clients is quality management ("QM"), which includes, *inter alia*, "reporting on the quality, timeliness, and effectiveness of anesthesia care provided by its affiliated providers to government payers (Medicare, Medicaid), commercial payers (*e.g.*, Cigna, Aetna, UnitedHealthcare), the client Facilities, and various accreditation and oversight agencies." (*Id.* ¶ 4). QM, in turn, relies on revenue cycle management ("RCM") (*id.* ¶¶ 2, 4), which is defined generally as "the administration of transactions . . . from . . . medical encounters . . . ." (*id.* ¶ 3).

After almost twenty years of handling the services itself (*id.* ¶ 30), Plaintiff found that "provi[ding] . . . RCM, QM[,] and related operational services for clients was . . . time-consuming and costly" (*id.* ¶ 32), and "decided to outsource" them (*id.* ¶ 33). Plaintiff ultimately "issued a nationwide request for proposals from expert anesthesia RCM firms who could handle the volume and complexities associated with anesthesia billing throughout the United States." (*Id.* ¶ 35). This search led Plaintiff to PST.[2] (*Id.* ¶ 37).

II.  Pre-Contract Negotiations

Plaintiff alleges that as PST courted Plaintiff, it made a variety of misrepresentations. (*See generally id.* ¶¶ 38-78). PST's misrepresentations concerned, *inter alia*, whether it had ever been sued (*id.* ¶¶ 40(a), 42), its technical capabilities and the software employed (*e.g., id.* ¶¶ 38-39, 43(a), 44, 50, 52, 54, 57-58, 60-65, 74-75), whether it had a "perfect track record" (*id.* ¶¶ 43(c),

---

[2] Although Plaintiff named CHT (PST's successor-in-interest) as a Defendant, for ease of reference, understanding, and continuity, because Plaintiff contracted with PST, the Court refers to that entity herein.

44), its personnel (*e.g.*, *id*. ¶¶ 47-48, 51), its expertise (*e.g.*, *id*. ¶¶ 38-39, 47, 49), its employee turnover (*id*. ¶¶ 48, 51), whether Plaintiff would have to secure funding for the transition of services (*e.g.*, *id*. ¶¶ 43(b), 53, 55), and whether the transition would increase collection rates (*e.g.*, *id*. ¶¶ 43(a), 44). Accepting these representations, Plaintiff disbanded its "RCM offices and [terminated] the more than 140 people it employed there, and transitioned away QM personnel, due to the redundancy in operations." (*Id*. ¶ 78; *see also id*. ¶ 125). This decision rendered Plaintiff completely reliant on PST for RCM and QM services. (*Id*. ¶ 78).

III.  The Master Services Agreement and Deterioration of the Parties' Relationship

The parties executed a contract, the Master Service Agreement ("MSA"), on December 23, 2013. (*Id*. ¶ 79; *see also* MSA Pt. 1 at 1).[3] Under the MSA, PST agreed to perform a variety of services, including, *inter alia*: (1) enrolling and recredentialing providers (MSA Pt. 1 at 17); (2) managing payer contracts and, on request, negotiating contracts and performing "deep dive" analyses (*id*. at 18-19); (3) providing quality control services (*id*. at 21); (4) "implement[ing] and maintain[ing] a billing regulatory compliance program," which encompassed using specific programs "to identify billing and remittance patterns that deviate from the norm" (*id*. at 24); (5) providing staff trained and certified to provide services, along with an assigned client manager (*id*. at 7, 10); (6) performing RCM services (*id*. at 13-16); and (7) providing staff trained to handle the transition from in-house operations (*id*. at 5-6; MSA Pt. 2 at 1). Plaintiff maintains that PST breached each of these, and other, terms. (*See* FAC ¶ 197).

---

[3] The MSA was annexed to the First Amended Complaint. The main body of the contract, Exhibit 2 to the First Amended Complaint, was filed over two docket entries. For ease of reference, Doc. 33-2 (which contains the first thirty-one pages) will be cited as "MSA Pt. 1," and Doc. 33-3 (which contains the last twenty-seven pages) will be cited as "MSA Pt. 2." PST's Request for Proposals Response ("RFPR"), Exhibit 1 to the First Amended Complaint <u>and</u> Attachment 2 to the MSA, was filed as Doc. 33-1. References to the MSA and RFPR will correspond to the pagination for that particular docket entry generated by ECF.

Although the MSA began on March 1, 2014 and called for an initial term of five years (MSA Pt. 1 at 10), the parties terminated their relationship on July 1, 2018. (FAC ¶ 140). According to Plaintiff, the four years during which the MSA governed the parties' relationship were marred with PST's deficient performance and attempts to undermine Plaintiff's business relationships. (*See id.* ¶¶ 92-139). In fact, Plaintiff contends that on at least one occasion, one of PST's agents contacted one of Plaintiff's clients and advocated PST's "ability to directly provide anesthesia billing and related services." (*Id.* ¶ 139; *see also id.* ¶ 204). As a result of PST's breaches, Plaintiff maintains it suffered myriad damages, specifically: (1) lost revenues and profits in connection with collection rates (*id.* ¶¶ 143-50); (2) lost reputation and good will (*id.* ¶¶ 151-58); (3) lost revenue associated with payer contract mismanagement (*id.* ¶¶ 159-62); (4) unnecessary fees, interest, and expenses which decreased Plaintiff's valuation by approximately thirty to fifty million dollars (*id.* ¶¶ 163-68); (5) loss of capital to invest in client relationships (*id.* ¶¶ 169-71); (6) terminations and downsizing (*id.* ¶ 172); (7) lost financial incentives from government medial programs (*id.* ¶¶ 173-77); (8) time spent rectifying PST's errors (*id.* ¶ 178); (9) its inability to mitigate damages (*id.* ¶¶ 179-81); and (10) reducing Plaintiff's ability to offer services to the public (*id.* ¶¶ 182-83).

When the parties separated, Plaintiff's valuation had fallen from a pre-relationship estimation of $55,000,000 to approximately $20,000,000. (*Id.* ¶ 164). Plaintiff maintains that it "reserved its rights to pursue any available claims against PST" (FAC ¶ 141; *see also id.* ¶ 15), and, through this action, seeks to pursue those rights.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion enables a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citing *Twombly*, 550 U.S. at 556). The factual allegations pled "must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

"When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Thus, the Court must "take all well-ple[d] factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff[]." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). The presumption of truth, however, "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678 (alteration in original)). Therefore, a plaintiff must provide "more than labels and conclusions" to show entitlement to relief. *Twombly*, 550 U.S. at 555.

In addition, the Federal Rules of Civil Procedure require a heightened level of specificity when pleading claims sounding in fraud. Specifically, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), "the

who, what, when, where, and how: the first paragraph of any newspaper story." *Backus v. U3 Advisors, Inc.*, No. 16-CV-8990, 2017 WL 3600430, at *9 (S.D.N.Y. Aug. 18, 2017) (quoting *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 520 (S.D.N.Y. 2014)).

## ANALYSIS

I. First Claim for Relief: Breach of Contract

"Under New York law[4], a breach of contract claim requires (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, --- F. Supp. 3d ---, 2020 WL 5211062, at *8 (S.D.N.Y. Sept. 1, 2020) (quoting *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017)). With respect to this claim for relief, Defendants argue that: (1) any claim for breach of the implied covenant of good faith and fair dealing must "be dismissed as duplicative of [Plaintiff's] breach of contract cause of action" (Def. Br. at 15); and (2) Plaintiff failed to link any breach to any specific damages (*id*. at 18-20). The Court addresses these arguments *seriatim*.[5]

---

[4] The MSA provides that it "shall be governed by the laws of the State of New York. Any controversy arising out of this Agreement shall be submitted only to the federal or state courts for Westchester County, State of New York. The aforesaid applicable law shall apply without regard to conflicts of laws provisions thereof." (MSA Pt. 1 at 9).

[5] Defendants argue also for dismissal insofar as Plaintiff seeks damages that are unavailable under the MSA (*i.e.*, consequential damages) or beyond its liability cap. (Def. Br. at 20-24; *see also* MSA Pt. 1 at 6). The Court does not address these arguments at this juncture because "a motion to dismiss is addressed to a 'claim'—not to a form of damages." *New York ex rel. James v. Pennsylvania Higher Educ. Assistance Agency*, No. 19-CV-9155, 2020 WL 2097640, at *18 (S.D.N.Y. May 1, 2020) (quoting *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 (S.D.N.Y. 2010)); *see also Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 536 (S.D.N.Y. 2013) (denying motion to dismiss plaintiff's request for punitive damages because it was "procedurally premature").

A. <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Schiff v. ZM Equity Partners, LLC*, No. 19-CV-4735, 2020 WL 5077712, at *7 (S.D.N.Y. Aug. 27, 2020) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)). This covenant "is not designed to enlarge or create new substantive rights between the parties," *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 479 (S.D.N.Y. 2007), but "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 364 (S.D.N.Y. 2012) (quoting *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011)). The covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract," and may "survive[] a motion to dismiss where the implied promise protects either the contract's central purpose or a party's right under a specific contractual provision." *Schiff*, 2020 WL 5077712, at *7 (alteration in original, internal citations and quotation marks omitted). Practically, a breach of the implied covenant of good faith and fair dealing requires the pleader to identify an obligation which supports the written terms of the agreement itself but is not *in haec verba* contained therein. A breach of the implied covenant is not a claim for relief separate from one for breach of contract; rather, it is, itself, a breach of contract. *Trahan v. Lazar*, 457 F. Supp. 3d 323, 358 (S.D.N.Y. 2020) (quoting *Fishoff*, 634 F.3d at 653); *see also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 205 (S.D.N.Y. 2011).

Plaintiff pled that PST breached the implied covenant of good faith and fair dealing by: (1) hiding its noncompliance with the MSA (FAC ¶¶ 199-200); (2) failing to fulfill its obligations under the MSA (*id*. ¶¶ 201, 203); (3) billing for claims that could not be collected (*id*. ¶ 202); and

7

(4) poaching clients (*id.* ¶¶ 198, 204). The first three categories complain merely about PST's compliance with the MSA and cannot support a claim for breach of the implied covenant; "[a] cause of action to recover damages for breach of the implied covenant . . . 'cannot be maintained' where 'the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of the contract.'" *Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, 736 F. App'x 274, 278 (2d Cir. 2018) (quoting *Deer Park Enters., LLC v. Ail Sys., Inc.*, 870 N.Y.S.2d 89, 90 (App. Div. 2008)); *see also Corazzini v. Litton Loan Servicing LLP*, No. 09-CV-199, 2010 WL 1132683, at *7 (N.D.N.Y. Mar. 23, 2010) (dismissing claim for breach of the implied covenant where the claim "only repeat[ed] the allegations that comprise Plaintiff's breach of contract claim, and those allegations consist of Defendants' non-compliance with a term of their contract").

The latter category, stealing Plaintiff's clients and undermining relationships, constitutes a breach of the implied covenant of good faith and fair dealing on the facts alleged. Plaintiff suggests that the MSA's central purpose, its raison d'être, was to outsource administrative functions from Plaintiff to PST. (FAC ¶ 33; *see also* MSA Pt. 1 at 1 ("WHEREAS, [Plaintiff] desires . . . billing and accounts receivable management, consulting and transition services . . . .")). More pointedly, the MSA existed because Plaintiff wanted PST's assistance in running one aspect of its nationwide, multimillion-dollar business. (*See, e.g.*, FAC ¶¶ 1, 13, 35, 47, 72, 104, 106, 119, 121, 142, 147, 153, 163-68). In light of that purpose, Plaintiff's allegation that PST actively undermined client relationships and sought to steal clients as Plaintiff suffered—ostensibly as a result of PST's noncompliance with the MSA—represents a breach of the implied covenant of good faith and fair dealing separate from the MSA's express provisions. *See Atlas Elevator Corp. v. United Elevator Grp., Inc.*, 910 N.Y.S.2d 476, 478 (App. Div. 2010) (plaintiff stated claim for breach of the implied covenant where defendants, who had acquired a confidential customer list during negotiations

before the "unconsummated" deal, "develop[ed] maintenance and service contracts with the plaintiff's customers by use of the plaintiff's customer list").

Accordingly, Defendants' motion to dismiss Plaintiff's claim for breach of contract, to the extent it seeks redress for a breach of the implied covenant of good faith and fair dealing concerning stealing Plaintiff's clients and undermining Plaintiff's customer relationships, is denied. The remainder of Plaintiff's breach of the implied covenant of good faith and fair dealing theories are dismissed.

### B. Sufficiency of Breaches and Damages

Defendants argue initially that Plaintiff failed to plead with the requisite specificity how PST breached "specific provisions in the MSA" or "how those alleged breaches led to [Plaintiff's] purported damages." (Def. Br. at 18). Yet, Defendants narrow this argument by conceding that Plaintiff identified at least "seven contractual provisions that were breached" but arguing that six of those breaches are not actionable because Plaintiff "fail[ed] to allege specific damages" associated with those breaches aside from its general claim for damages no less than $100,000,000. (*Id*. at 19; *see also* FAC ¶ 210). In short, "[w]hile speculative, this allegation is sufficient for [Plaintiff] to state a breach of contract claim." *Arista Coffee Inc. v. Casale*, No. 18-CV-6237, 2020 WL 1891882, at *7 (E.D.N.Y. Apr. 16, 2020) (allegation that defendant's "various breaches" resulted in "damages in an amount not yet determined or ascertainable" stated a breach of contract claim under New York law). As such, the motion to dismiss the breach of contract claim for failure to plead causation between breaches and specific damages is denied.

## II. Second Claim for Relief: Fraud in the Inducement

There are two species of claims for fraud in New York: "[f]raud by affirmative misrepresentation, or actual fraud, and fraud by omission, or fraudulent concealment . . . ." *Wiedis*

9

*v. Dreambuilder Invs., LLC*, 268 F. Supp. 3d 457, 466 n.3 (S.D.N.Y. 2017) (first alteration in original, internal quotation marks omitted). To state the former claim for relief, which Plaintiff pursues here, it must allege: "(1) a material misrepresentation . . . of fact[;] (2) made by defendant with knowledge of its falsity[;] (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 359 (S.D.N.Y. 2009) (quoting *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 235 (2d Cir. 2006)). Defendants contend, *inter alia*, that this claim for relief must be dismissed because it is duplicative of the breach of contract claim. (Def. Br. at 9-11). The Court agrees.

The basis of Plaintiff's fraud claim is that PST induced Plaintiff into the MSA through various misrepresentations. Explicitly, Plaintiff asserts that "PST knew that it did not have the same infrastructure, resources, personnel, tools, software, or other capabilities and expertise of McKesson [its parent] (or ready access thereto) to deliver on its promises" and that "PST . . . lied about its then present capabilities, resources, and experiences." (FAC ¶¶ 214-15). "Where a fraud claim is based on inducement to enter a contract, the fraud claim is duplicative [of a claim for breach of contract] unless the plaintiff '(i) demonstrate[s] a legal duty separate from the duty to perform under the contract; or (ii) demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek[s] special damages.'" *Mariano v. CVI Invs. Inc.*, 809 F. App'x 23, 26 (2d Cir. 2020) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, 98 F.3d 13, 19 (2d Cir. 1996) (first alteration added)). Plaintiff does not identify the existence of a

10

duty outside the contract or connect any special damages[6] to the alleged misrepresentations (*see* FAC ¶¶ 211-21); the focus, then, concerns whether Plaintiff pled a "misrepresentation collateral or extraneous to the contract." It has not done so.

Plaintiff complains that PST knew it did not have the resources of McKesson and that it misrepresented its infrastructure as it courted Plaintiff. (FAC ¶¶ 214-15). These issues were addressed in the one-hundred-ninety-six-page RFPR which was "attached . . . and . . . incorporated . . . by reference" into the MSA. (MST Pt. 1 at 9). The RFPR contains representations regarding, *inter alia*: PST's relationship to McKesson, organizational structure, expertise and experience being offered to Plaintiff, locations of offices, staffing and support, existence of lawsuits or fines, and software, programs, and processes utilized. (*See, e.g.*, RFPR at 1-3, 5-11, 13-19, 27-37, 42-43, 45-46, 53-56, 60-67, 75-82, 84-87, 92-95, 103-104, 107-12, 119-22, 128, 144-49, 152-53). Accordingly, Plaintiff has pled issues contained within the MSA, not misrepresentations extraneous or collateral thereto. *See Khodeir v. Sayyed*, 323 F.R.D. 193, 203 (S.D.N.Y. 2017) (noting that the counterclaim for fraud did not concern a collateral promise because it concerned a clause "contained in the contract itself"); *Telesco v. Neuman*, No. 14-CV 3480, 2015 WL 2330166, at *3 (S.D.N.Y. Mar. 11, 2015) (dismissing fraud claim as duplicative "[b]ecause nothing" in the

---

[6] Plaintiff argued that it suffered special damages apart from the breach of the MSA (*see* Opp. Br. at 8-9), but the First Amended Complaint reveals otherwise. Even if the Court were to assume that Plaintiff met the heightened pleading standard required by Rule 9(b), Plaintiff seeks the same monetary damage—*i.e.*, "in no event less than $100,000,00.00"—for both claims for relief, without specification. (*Compare* FAC ¶ 210, *with id.* ¶ 221). This strengthens the Court's conclusion that the fraud and breach of contract claims are duplicative. *See Bell v. Carey*, No. 18-CV-2846, 2020 WL 3578150, at *4-5 (S.D.N.Y. July 1, 2020) (noting that the plaintiff sought the same amount of damages under his fraud and breach of contract claims and concluding that "[b]ecause Plaintiff seeks monetary damages for the fraudulent inducement (for which he would not be entitled), those claims must be dismissed as duplicative of the breach of contract claim"); *see also Mosaic Caribe, Ltd. v. AllSettled Grp., Inc.*, 985 N.Y.S.2d 33, 35 (App. Div. 2014) (finding fraud claim duplicative of breach of contract claim where, "[a]mong other things, apart from an unelaborated request for punitive damages in connection with the fraud claim," it sought "the same damages as the breach of contract claim").

defendant's "alleged oral representations goes beyond what is contained" in the contract); *see generally Int'l Bus. Machs. Corp. v. De Freitas Lima*, No. 20-CV-04573, 2020 WL 5261336, at *14 (S.D.N.Y. Sept. 3, 2020) (observing, on a misappropriation of trade secrets claim in a contract dispute, "that a plaintiff cannot turn a contract claim into a tort claim arising from a duty similar to the obligations set forth in the contract"), *aff'd sub. nom. Int'l Bus. Machs. Corp. v. Lima*, --- F. App'x ---, 2021 WL 222129 (2d Cir. Jan. 22, 2021).

Consequently, Plaintiff's claim for fraud in the inducement is dismissed because it is duplicative of Plaintiff's breach of contract claim.[7]

## CONCLUSION

Based upon the foregoing, the motion to dismiss is GRANTED in part. The second claim for relief, fraud in the inducement, is DISMISSED. The first claim for relief, breach of contract, as modified herein concerning the covenant of good faith and fair dealing, shall proceed to discovery. Defendants are directed to file an Answer to the First Amended Complaint within fourteen (14) days of the date of this Memorandum Opinion and Order. The Court will issue an Initial Pretrial Conference Order and set a conference date in short order.

The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 42.

SO ORDERED:

Dated: White Plains, New York
February 16, 2021

PHILIP M. HALPERN
United States District Judge

---

[7] Given the Court's conclusion that the fraud claim is duplicative of the breach of contract claim, it need not and does not reach Defendants' alternative theories in support of dismissal. (*See* Def. Br. at 10-15).